1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 5/4/10**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

ELAN and REVEREND ORACLE,

Plaintiffs,

v.

SANTA CRUZ COUNTY PLANNING
DEPARTMENT; TOM BURNS; SANTA CRUZ
COUNTY; ELLEN PIRIE; JAN BEAUTZ; NEAL
COONERTY; TONY CAMPOS; and MARK W.
STONE,

Defendants.

Case Number C 09-373 JF (PVT)

**ORDER[1] GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

RE: Docket No. 30

Plaintiffs Elan and Reverend Oracle ("Plaintiffs") assert claims against the County of

Santa Cruz ("County") and a number of its officials ("Defendants") pursuant to 42 U.S.C. §

1983, the Due Process Clause of the United States Constitution, and various state and local

laws.  The operative complaint asserts nine claims: (1) petition for writ of mandate; (2) petition

for administrative mandamus; (3) cancellation of instrument and removal of cloud on title; (4)

[1] This disposition is not designated for publication in the official reports.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

failure to perform a mandatory duty; (5) imposition of excessive and improper fees; (6) violations of civil rights under 42 U.S.C. § 1983; (7) inverse condemnation; (8) declaratory relief; and (9) preliminary and permanent injunction.  On April 2, 2010, the Court heard argument on Defendants' motion for summary judgment.  For the reasons set forth below, the motion will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

The underlying facts are largely undisputed.  Indeed, many sections of the parties' respective factual summaries are identical.  The following is taken largely from Plaintiffs' opposition brief, which appears to have used the statement of facts from Defendants' motion as a template.

**A.    The Santa Cruz County Planning Department**

The Santa Cruz County Planning Department ("Planning Department") administers the land use permit process in Santa Cruz County.  The Department is responsible for building permits and discretionary zoning permits.  It also is responsible for enforcement of the County's building, zoning, and environmental regulations.  (Deming Decl. ¶ 9.)  The Department's Code Enforcement Section employs investigators who investigate complaints and enforce code sections concerning land use violations.  The Department has a separate Development and Permit Application Review Section that employs staff planners who review discretionary permit applications for zoning and development.

Decisions with respect to building permit applications are appealable to the County Board of Supervisors.  (Burns Decl. ¶¶ 2-3, Ex. A & B.)  Discretionary decisions involving minor development permits, including zoning issues, are appealable to the Planning Director under County Code Section 18.10.  (*Id.* at ¶ 4, Ex. C, and Ex. A at 14; and Attach. 7.)  Decisions by Code Enforcement staff concerning the posting and recording of red tags may be challenged, within twenty days of the posting, at a meeting with the Planning Director or his designee, to which the property owner may present evidence that the violation does not exist ("protest meeting").  County Code § 19.01.070.  When the County decides to record a notice of violation

("NOV") against an owner's land title, the decision "is final and not subject to further appeal." County Code § 19.01.080; Burns Decl. ¶ 5, Ex. D.

**B.    The County's fence and hedge regulations**

County Code Section 13.10.525 regulates the height of fences and hedges that abut a road. One of the purposes of the regulation is to ensure an adequate line of sight for pedestrians and motorists using the road. (*Id.*) Under County Code § 13.10.525(c)(2), subject to minor exceptions, no fence or hedge may exceed three feet in height if it is located in a front yard or other area abutting a street, except that heights up to six feet may be allowed by a Level III Development Permit Approval. (*Id.*) There is an exception to this general rule for fences on properties located in agricultural zone districts, where fencing for agricultural purposes may be up to six feet in height without the need for a development permit, provided that such fencing is "1) six feet or less in height; 2) made of wire which is spaced a minimum of six inches apart (i.e., typical field fencing); or 3) made of horizontally oriented wooden members which are spaced a minimum of one foot apart (i.e., typical wooden corral fencing)." County Code § 13.10.525(c)(3).

**C.    Plaintiffs' hedge and fence**

The instant case concerns property formerly owned by Plaintiffs located at 396 Tolak Road in Aptos, California. Plaintiffs purchased the property in March 2001. The property sits at a curve where Tolak Road meets Horizon Way. The perimeter of the property facing the road features pittasporum hedges for privacy. By 2005, the hedges had grown naturally to a height of eight to ten feet. (Oracle Decl. ¶ 4.) The zoning designation of this property is Residential Agriculture.

In December 2005, Plaintiffs filed Development Permit Application ("DPA") 05-0780 for two circular driveway gates and a black vinyl chain link fence to separate the front of their property from Tolak Road and Horizon Way. (Deming Decl. ¶ 10, Ex. D; Elan Dep. 47:16-48:2; David Keyon Dep. 15:7-17:25; 21:13-23:4; 25:2-13.) At that time, a hedge ran along the front of Plaintiffs' property next to the roads. (Elan Dep. 29:2-33:23.) Plaintiffs were

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(JFLC3)

advised that they needed to file for this type of permit by the Planning Department intake personnel.  (Oracle Decl. ¶ 6.)

While DPA 05-0780 was under submission, Plaintiffs' neighbors filed complaints with the County, contending that the height of the hedge was dangerous because it impeded visibility for motorists and it did not comply with County Code.  (Deming Decl. ¶ 11, Ex. E; Keyon Dep. 34:9-36:3 and Dep. Ex. 102.)  On April 19, 2006, Richard Zscheile ("Zscheile"), one of Plaintiffs' neighbors, submitted a formal code complaint stating that: "On their corner parcel, [Plaintiffs] have planted large hedge plants near the roads which have grown to be 7-8' high, causing two blind corners.  Drivers and pedestrians cannot see oncoming vehicles.  Public safety is therefore seriously impacted . . . ."  (Deming Decl. ¶ 12, Ex. F.)

On May 3, 2006, the County approved DPA 05-0780 with the condition that Plaintiffs lower the height of the hedge abutting the road to three feet at certain locations along the perimeter of the proposed fence.  (Deming Decl. ¶ 13, Ex. G; Keyon Dep. 47:8-19; 51:10-53:18 and Dep. Ex. 103 and 104.)  Plaintiffs signed the signature page of the Staff Report and Development Permit, agreeing to accept the permit with the outlined conditions.  (Elan Dep. 52:16-53:16; Deming Decl. ¶ 13, Ex. H.)  Plaintiffs testified that they signed the signature page without realizing that it contained the condition, as it was not mentioned in the Staff Report but was listed with other conditions in an attachment.  (Oracle Decl. ¶ 8; Elan Dep. 52:16-53:16; Deming Decl. ¶ 13, Ex. H.)

**D.    Initial code compliance activity concerning Plaintiffs' hedge**

In April 2006, Code Compliance Officer Aaron Landry ("Landry") received Zscheile's complaint concerning the hedge and conducted a site inspection.  According to Plaintiffs, Landry recognized that the hedge violated the County Code, but he did not believe that there was a line-of-sight problem or that the hedge was otherwise dangerous and told Elan Oracle, "I see no violation here." (Elan Decl. ¶9.)  Landry decided to discuss the issue with his supervisor to determine whether under these circumstances he had to issue an NOV.  Landry believes he spoke to his supervisor, but he cannot recall the content of the conversation.  (Landry Dep.

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(JFLC3)

14:16-20:24; 24:23-31:21; 33:21-34:4; 34:20-36:8 and Dep. Ex. 1, 23, 24, 25; Fitzpatrick Dep. 63:6-64:9.)

Over the next several months, Plaintiffs' neighbors continued to contact the County requesting that it take action on their complaints. (Deming Decl. ¶ 14, Ex. I.) In August 2006, Code Compliance Investigator Kevin Fitzpatrick ("Fitzpatrick"), who had no knowledge of Landry's prior visit (Fitzpatrick Dep. 37:16-38:6), conducted a second site inspection of the property after receiving a complaint from one of Plaintiffs' neighbors. Fitzpatrick determined that the height of the hedge did violate the County Code but that the complaint was nonetheless "not valid" and that there was no sight-line issue associated with the hedge. He recorded his conclusion in the Code Compliance Department's official record. (Fitzpatrick Dep. 33:16-43:3; 60:12-18; 64:14-22; 65:15-19; 67:2-21; 68:14-69:5 and Dep. Ex. 1.)

In November 2006, David Keyon ("Keyon"), the staff planner assigned to DPA 05-0780, sent a letter to Plaintiffs notifying them that they were in violation of the conditions of approval for the permit, and that failure to comply with the conditions would result in a referral to Code Compliance. (Keyon Dep. 63:5-64:11 and Dep. Ex. 105; Elan Dep. 63:7-22; Deming Decl. ¶ 15, Ex. J.) Plaintiffs wrote Keyon a letter in response, asking him to cancel the permit application and stating, "we withdraw this application." (Deming Decl. ¶ 16, Ex. K; Keyon Dep. 70:20-71:16 and Dep. Ex. 106; Elan Dep. 64:7-66:3; Oracle Dep. 59:11-60:14.)

On February 2, 2007, after being directed by a supervisor to do so, Fitzpatrick posted a NOV, or "red flag," on Plaintiffs' property asserting that the property was in violation of County Code Section 13.10.525(c)(2). (Fitzpatrick Dep. 24:2-23; 25:13-26:4; 28:2-31:6; 65:20-24; 70:3-72:25; 79:16-80:16; 91:20-93:3; 96:6-20; 121:3-4 and Dep. Ex. 4, 5; Elan Dep. 74:6-19; 77:4-18.) No reason was provided, and Fitzpatrick himself did not agree with the decision. (Fitzpatrick Dep. 71:12-72:1.) Two weeks prior to the posting, Zscheile had written County Supervisor Ellen Pirie ("Pirie"), who had been in contact with the Planning Department regarding Plaintiffs' property, to demand posting of the red flag. (Pirie Dep. 16:18-24; 22:24-23:13; Ex. 45; Keyon Dep. 133:5-10.)

1   On February 6, 2007, the County sent Plaintiffs a letter notifying them that it intended to

2   record the NOV if the violation was not corrected within thirty days.  (Fitzpatrick Dep. Ex. 2 at

3   667-669.)  On or around March 2, 2007, the neighborhood road association sent the County a

4   letter reflecting that it had asked Plaintiffs to reduce the height of their hedge to three feet per

5   the County Code.  (Deming Decl. ¶ 17, Ex. L.)

6          On March 5, 2007, Plaintiffs hired retired code enforcement supervisor David Laughlin

7   ("Laughlin") to represent them in their dealings with the Planning Department.  (Oracle Dep.

8   88:7-12; Elan Dep. 80:8-12; Keyon Dep. 103:15-107:17; Deming Decl. ¶ 18, Ex. M.)  On that

9   same day, per the provisions of the County Code, Plaintiffs requested a "protest meeting" to

10  challenge the NOV.  (Fitzpatrick Dep. Ex. 6; Deming Decl. ¶ 19, Ex. N.; Oracle Decl. ¶ 14, Ex.

11  C.)  The protest meeting was scheduled for May 16, 2007.  On March 22, 2007, Plaintiffs sent a

12  letter to Keyon stating that the conditions on the original permit were not acceptable and that

13  they intended to re-enter the application process to seek revised conditions.  (Deming Decl. ¶¶

14  19-20, Ex. N & O).  Plaintiffs' letter also informed the County of traffic control actions taken

15  from 2005 to 2007 to enhance safety of the curve along the road.  Plaintiffs provided

16  photographs documenting a line of sight of more than 100 feet at the curve, disputing the

17  Planning Department's statement that the curve was at an intersection.  (Elan Decl. ¶ 15, Ex. A;

18  Oracle Decl. ¶ 16; Deming Decl. ¶¶ 19-20.)

19         On April 17 and 26, 2007, Laughlin wrote letters to Keyon advising that Plaintiffs were

20  amenable to lowering a portion of their hedge to three feet and wanted to re-enter the application

21  process.  (Keyon Dep. 86:11-88:11 and Dep. Ex. 109; Deming Decl. ¶ 21, Ex. P.)  On May 13,

22  2007, three days before the scheduled protest hearing, Plaintiffs requested that the hearing be

23  postponed because they were prepared to re-enter the permit process.  (Keyon Dep. 9:24-90:15

24  and Dep. Ex. 110.)  The County thereafter re-scheduled the protest meeting for June 14, 2007.

25  (Oracle Decl. ¶ 17; Fitzpatrick Dep. 125:5-23 and Dep. Ex. 9.)

26  **E.     Plaintiffs' second development permit application**

27         In June 4, 2007, a meeting took place between Plaintiffs, Keyon, Laughlin, Code

28

6

Enforcement supervisor Ken Hart ("Hart"), and Assistant Planning Director Mark Deming ("Deming"). The purpose of the meeting was to discuss a possible resolution of Plaintiffs' permitting issues. (Deming Dep. 18:14-22:12; 24:3-31:8; Keyon Dep. 90:22-94:6; Elan Dep. 84:13-85:18.) At the meeting, Hart represented to Plaintiffs that the County would not record the NOV while Plaintiffs were in the permit process and trying to resolve the issues. (Hart Dep. 23:8-25:19; 55:23-56:9; Elan Dep. 85:19-24.) In reliance on this promise, Plaintiffs withdrew their request for a protest meeting concerning the posting of the NOV. (Oracle Decl. ¶ 18; Fitzpatrick Dep. 129:22-130:5 and Dep. Ex. 1-A & 9.)

Keyon and Deming thereafter conducted a site inspection to review the line of sight around Plaintiffs' hedge. Following this site inspection, Keyon corresponded via e-mail with Laughlin, explaining that if Plaintiffs moved the hedge five feet back from the road and cut it down to six feet, a permit could be issued. (Deming Dep. 31:9-42:21; 46:24-48:21; 90:18-21 and Dep. Ex. 27; Keyon Dep. 94:9-100:8 and Dep. Ex. 27.) Plaintiffs subsequently cut the hedge to six feet in height for the entire length of their property and moved the hedge back five feet as requested by Keyon. (Oracle Decl. ¶ 19, Ex. E.)

On June 12, 2007, Plaintiffs listed the property for sale with Sally Lyng ("Lyng"), a real estate broker. They initially listed the property at $2,495,000 based on Lyng's analysis of the real estate market, but reduced the listing price to $2,395,000 in July 2007. (Oracle Decl. ¶ 20.)

On June 28, 2007, Plaintiffs filed their second Development Permit Application–DPA 07-0327–again seeking to construct a six-foot high chain link perimeter fence with two gates. (Deming Decl. ¶ 23, Ex. R; Elan Dep. 97:1-98:21.) Notwithstanding Keyon's earlier e-mails with Laughlin, Deming determined that in order to provide sufficient sight-lines around the curve, the hedge could not remain at six feet in height at its current location because in his opinion it created a serious sight distance problem. (Deming Dep. 48:25-51:5; 51:25-54:22; 86:14-87:15 and Dep. Ex. 28 & 29; Keyon Dep. 100:13-101:16; Deming Decl. ¶ 24.) In June and July, the County received additional letters from Zscheile complaining about the danger posed by the hedge. (Deming Decl. ¶¶ 22, 25 and Ex. Q and S.)

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(JFLC3)

On August 10, 2007, the County approved DPA 07-0327, with conditions that Plaintiffs trim their hedge as set forth in the Staff Report accompanying the Permit.  (Keyon Dep. 108:14-116:25 and Dep. Ex. 30, 33; Deming Dep. 54:25-60:8; 92:10-99:7 and Dep. Ex. 30, 33; Elan Dep. 99:16-100:18; Deming Decl. ¶ 26, Ex. T.)  On August 24, 2007, Plaintiffs appealed the conditions of DPA 07-0327, specifically those involving trimming the vegetation. (Deming Decl. ¶ 27, Ex. U; Elan Dep. 103:4-104:14; Keyon Dep. 126:7-23.)

**F.    The County records the Notice of Violation**

On or about August 28, 2007, Code Enforcement Officer Laura Madrigal ("Madrigal") received notice from a clerical employee that Plaintiffs' code violation had not been resolved. Based on her standard practice, Madrigal recorded the NOV.  (Madrigal Dep. 5:15-21; 21:13-25:6; 26:16-27:21; 32:10-33:16 and Dep. Ex. 98.)  The cover letter Madrigal included with the NOV incorrectly stated that the County had conducted a follow-up investigation. (Fitzptatrick Dep. 129:3-131:9; Madrigal Dep. 26:1-19.)  Madrigal was not aware that Hart had told Plaintiffs that the NOV would not be recorded while they were engaged in the permit process.  (Madrigal Dep. 26:16-27:6.)  At his deposition, Hart conceded that the NOV was recorded in error, given his earlier statement to Plaintiffs that the NOV would not be recorded while Plaintiffs still were engaged in the permit process. (Hart Dep. 57:5-9; 82:5-15.)  Plaintiffs wrote to the Planning Department several times asking it to remove and cancel the recorded red tag.

**G.    The appeal of DPA No. 07-0327**

On October 4, 2007, the Planning Director's designee, Don Bussey, issued a decision concerning Plaintiffs' appeal of the condition that they trim their hedge.  Bussey nullified the approval of the permit with conditions and remanded the project back to staff to consider new sight distance information from Plaintiffs' traffic engineer, Ron Marquez ("Marquez"). (Deming Decl. ¶ 28, Ex. V; Elan Dep. 104:15-107:22.)  At the appeal hearing, Bussey described the permit restrictions as "draconian."  (Oracle Decl. ¶ 25; Deming Decl. ¶ 28, Ex. V.)

On December 7, 2007, Planning Director Burns emailed Laughlin.  Burns wrote that he

8

"had a chance to sit down with the folks here involved in this application.  Quite frankly, I am a bit concerned about why we are entertaining this application at all. . . .  I see no basis at all for permitting such a feature.  Quite frankly, it appears the original permit, which the applicant refused to sign, was quite generous."  (Oracle Decl. ¶ 26, Ex. H.)

On December 26, 2007, Alice Daly ("Daly"), the County Project Planner assigned to the remanded application, sent an email to Laughlin stating that:

> it appears that your very best option might be to sign the original permit approval.
> While this may not be the outcome your clients prefer, it may be the only thing that
> CAN be approved per our ordinance requirements. . . . [I]f we were starting fresh
> with this, it is likely that additional trimming back of your shrubs would be
> required. . . . [M]y feeling is that–again, in light of what our ordinance specifies,
> additional information will not change our ability to approve something beyond
> what was originally approved here . . . .

(Oracle Decl. ¶ 27, Ex. I.)

On January 9, 2008, Plaintiffs wrote directly to Burns complaining that Daly already had made a decision without hearing the appeal or reviewing their new information.  They pointed out that a report from their traffic engineer, Marquez, showed that there was no sight line or safety hazard and requested that the County remove the restrictions on the Second Permit Application and remove the NOV.  (Oracle Decl. ¶ 28, Ex. J.)

Daly reconsidered Plaintiffs' application after the appeal (Keyon was no longer employed with the County).  (Daly Dep. 9:23-10:10; 15:24-16:18; 17:25-23:7; 29:7-25; 54:11-18 and Dep. Ex. 86; Deming Decl. ¶ 29.)  Daly considered the additional information from Plaintiffs' traffic engineer and conducted her own site inspection.  (Daly Dep. 34:15-35:21; 59:6-63:20; 77:9-81:15; 98:1-13; 99:8-102:10 and Dep. Ex. 89, 91, 92, and 95.)  Daly also took pictures of the hedge as part of her work.  (Daly Dep. 122:19-123:6; Daly Decl. ¶ 2, Ex. A.)  She conferred with Deming about the additional engineering data. (Deming Dep. 75:12-76:24.)  One of Plaintiffs' neighbors contacted Daly and expressed continued concern about the danger associated with the hedge.  (Daly Dep. 65:25-68:19.)

During this time period, the relationship between the County and Plaintiffs became contentious.  Plaintiffs were copying Fitzpatrick on e-mails they sent to Daly.  On February 8,

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(JFLC3)

2008, in response to one of the e-mails, Fitzpatrick wrote to Daly: "Alice, this violation has been recorded on title and code compliance will not be taking any action. Can you just deny their application and let them appeal your decision. [sic] all [sic] this crap is not worth your time." He testified that he sent this e-mail out of frustration about the amount of time that was being spent concerning the application. (Fitzpatrick Dep. 116:8-21; 138:2-142:8 and Dep. Ex. 13.) Daly testified that she did not take this e-mail into account in any way in making her decision on the permit. (Daly Dep. 51:19-52:11.) Fitzpatrick's supervisor was not aware of the e-mail until he reviewed a copy of it at his deposition, but confirmed that it was inappropriate, as did Burns. (Hart Dep. 68:16-70:15 and Dep. Ex. 13; Burns Dep. 137:5-23.)

On March 5, 2008, Fitzpatrick again was copied on an e-mail from Reverend Oracle, in which she stated that the red tag was unsubstantiated. Fitzpatrick took offense to this and responded. In an effort to support the truth of her statement, Oracle responded that she held three minister licenses. This irritated Fitzpatrick, who responded "would they be minister licenses of Babylon the Great" [sic]. (Fitzpatrick Dep. 117:19-118:10; 156:15-159:22 and Dep. Ex. 20; Burns Decl. ¶ 11, Ex. F.) Fitzpatrick concedes that the e-mail was inappropriate. (Fitzpatrick Dep. 164:10-165:21.) Hart and Burns both counseled Fitzpatrick about the e-mail; the episode resulted in Fitzpatrick taking a week off of work. (Hart Dep. 66:14-68:15; Burns Dep. 137:24-138:22.) Fitzpatrick wrote a follow-up e-mail to Oracle apologizing for inquiring about her minister licenses, and requesting that she remove him from all further e-mails. (Fitzpatrick Dep. 165:22-167:2 and Dep. Ex. 21.)

**H.    Issuance of the second permit with conditions**

During the period Daly was considering Plaintiffs' permit application, from October 2007 to April 2008, Plaintiffs repeatedly requested a face-to-face meeting with her. After a meeting set for November 16, 2007, was cancelled, Plaintiffs sent a series of emails to Daly seeking to reschedule, but they never received a response. (Oracle Decl. ¶ 32, Ex. M.)

Early in March 2008, Plaintiffs received a letter from Supervisor Pirie. Pirie stated that she did had not found any violations of County ordinances in the way Plaintiffs had been treated

1

2

and recommended that Plaintiffs ask "for permission to return to [their] first permit application."
(Oracle Decl. ¶ 33, Ex. N.)

3

4

5

6

7

8

9

On April 1, 2008, the County issued an Amended Staff Report and Development Permit
for Permit No. 07-0327.  The permit approved a six-foot fence and hedge around the perimeter
of Plaintiffs' property, and outlined the areas where the hedge could not exceed three feet in
height.  (Daly Dep. 75:11-18; 87:23-88:25; 89:14-91:6; 102:16-103:1; 104:12-109:10;
110:10-115:14; 131:11-135:19 and Dep. Ex. 96; Elan Dep. 113:20-114:11; Deming Decl. ¶ 29,
Ex. W.)  Plaintiffs did not appeal these permit conditions.  (Deming Decl., ¶ 29; Elan Dep.
114:12-20.)

10

11

On or about April 4, 2008, Plaintiffs removed the listing of the property from the multiple
listing service.  (Oracle Decl. ¶ 35.)

12

13

14

15

Defendants charged Plaintiffs fees in excess of $7,500 for time spent on Plaintiffs'
applications and the recordation of the NOV.  The bills sent to Plaintiffs contained no notice of
any deadline or procedure for Plaintiffs to protest or otherwise challenge the fees sought by the
County.  (Oracle Decl. ¶ 36.)

16

**I.      Plaintiffs sue the County**

17

18

19

In May 2008, Plaintiffs filed a lawsuit in the Santa Cruz Superior Court seeking writs of
mandate and other relief concerning the permitting and code enforcement decisions made by the
County.  (*See* Ex. A to County's Notice of Removal [Doc. No. 2].)

20

21

**K.     The County expunges the NOV and issues Plaintiffs a permit allowing Plaintiffs to
         keep their hedge at six feet**

22

23

24

In October 2008, the County expunged the recorded NOV and issued Plaintiffs a revised
permit allowing them to keep their hedge at a height of six feet.  (Deming Decl. ¶ 30, Ex. X and
Y.)

25

**J.      Plaintiffs sell the property**

26

27

Plaintiffs put the property back on the market in November 2008, shortly after the
expungement of the red tag.  Plaintiffs had the property appraised by Michael Barcells

28

11

("Barcells").  Barcells reported that the property had been worth $2,350,000 in February 2007, but that its value had dropped to $1,750,000 by November 2008 as a result of a worsening of the economy.  (Oracle Decl. ¶ 39, Ex. O and P.)  In the fall of 2009, Plaintiffs sold the property for $1,449,000. (Lyng Dep. 6:7-13; 14:13-15:2; 85:23-86:10 and Dep. Ex. 26; Elan Dep. 33:9-13.)

## II.  PROCEDURAL BACKGROUND

On January 21, 2009, Plaintiffs filed their First Amended Complaint ("FAC") in state court.  Defendants then removed the case to this Court.  On February 2, 2009, Defendants moved to dismiss the first five claims in the FAC for failure to state a claim upon which relief could be granted.  In an order dated May 15, 2009, the Court directed Plaintiffs to provide a more definite statement with respect to their mandatory duty claim, struck Plaintiffs' prayer for a refund of allegedly excessive fees pursuant to Cal. Gov't Code § 66020, and denied the motion in all other respects.  On June 15, 2009, Plaintiffs filed the operative Second Amended Complaint ("SAC").  Defendants answered on July 22, 2009, and filed the instant motion for summary judgment on all claims on January 14, 2010.  The Court heard oral argument on April 2, 2010.

## III. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that might affect the outcome of the case under the governing law.  *Id.* at 248.  There is a genuine dispute about a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  The moving party bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the party moving for summary judgment would not bear the ultimate burden of persuasion at trial, it must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the

12

nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets its initial burden, the burden shifts to the nonmoving party to present specific facts showing that there is a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

The evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  Summary judgment thus is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the material issue in its favor. *Liberty Lobby*, 477 U.S. at 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

## IV. DISCUSSION

### A.    Mootness of claims for writs of mandate

Plaintiffs' first three claims seek writs of mandate ordering (1) elimination of the red tag on their property record, (2) issuance of a building permit authorizing the improvements Plaintiffs sought to make and approving the height of their hedge, and (3) expungement of the NOV.  Defendants argue that these claims are moot because Plaintiffs no longer own the property.  Plaintiffs argue that the claims are not moot because they continue to seek damages and attorney's fees with respect to their writ claims.

The California mandamus statute limits the use of writs of mandate to the following situations:

> A writ of mandate may be issued by any court . . . to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled . . . .

Cal. Code Civ. Proc. § 1085.  A writ of mandate thus "lies to compel the performance of a legal duty," *Envtl. Prot. Info. Center, Inc. v. Maxxam Corp.*, 4 Cal. App. 4th 1373, 1380 (Cal. Ct. App. 1992), and where the conduct or condition sought to be enjoined has ceased or been resolved, a claim for a writ of mandate is moot.  *See Daily Journal Corp. v. County of Los Angeles*, 172 Cal. App. 4th 1550 (Cal. Ct. App. 2009) (holding that company's request for writ

of mandate to order county to terminate contract with company's competitor was moot, as

contract had expired and new invitation to bid had been issued); *Maxxam Corp.*, 4 Cal. App. 4th

at 1380 (holding that appeal from denial of petition for writ of mandate to order Department of

Forestry and Fire Protection to withdraw approval of timber harvest plans was moot where

lumber company had certified completion of harvesting work, and thus no longer could harvest

timber under the challenged plans).

The Court denied Defendants' motion to dismiss the writ claims on mootness grounds in

an order dated May 15, 2009.  However, as of that date, Plaintiffs had not yet sold the property.

Defendants' motion to dismiss was based solely on the County's voluntary removal of the red

flag, issuance of the requested permit, and the expungement of the Notice of Violation.  The

Court concluded that the claims were not moot because

> Defendants allegedly still have not done what they are legally required to do–that
> is, issue a lawful permit or determine that no permit is required.  Even if
> Defendants had done so, "[i]t is well settled that a defendant's voluntary cessation
> of a challenged practice does not deprive a federal court of its power to determine
> the legality of the practice."  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S.
> 283, 289 (1982).  Defendants' repeated reversals with respect to the legality of the
> hedge–in particular their sudden expungement of the red tag and issuance of the
> permit–appear to represent the height of arbitrary and capricious decisionmaking.
> Because Plaintiffs have alleged a plausible basis for believing that the challenged
> conduct will recur, the claims are not moot.

(Dkt. No. 15 at 8 (footnote omitted).)  Plaintiffs' sale of the property clearly alters this analysis.

The Court's previous order also addressed Plaintiffs' present argument that the

mandamus claims survive because they seek damages and attorneys' fees as well as equitable

relief:

> The Court notes that if the mandamus claims actually were moot,
> Plaintiffs' request for statutory damages in connection with the challenged conduct
> would not revive them.  While the mandamus statute does provide for an award of
> damages in connection with a mandamus action, such damages are available only
> "[i]f judgment [is] given for the applicant" in such an action.  Cal. Code. Civ. Proc.
> § 1095.  Where there is nothing to mandate, mandamus claims are moot, and there
> can be no mandamus judgment.  Plaintiffs' suggestion that damages may be
> recovered through a mandamus claim that is moot amounts to transparent
> bootstrapping.
> Plaintiffs' request for attorneys fees–statutory or otherwise–also would not
> sustain a live controversy.  It is well-established that "[t]he existence of an
> attorneys' fees claim . . . does not resuscitate an otherwise moot controversy."

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT
(JFLC3)

1

2

3

4

*Cammermeyer v. Perry*, 97 F.3d 1235, 1238 (9th Cir. 1996) (citing *Diamond v. Charles*, 476 U.S. 54, 70-71 (1985)); *see also Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480 (1990) (noting that "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim").  Instead, "[c]laims for attorneys' fees ancillary to the case survive independently under the court's equitable jurisdiction, and may be heard even though the underlying case has become moot." *Cammermeyer*, 97 F.3d at 1238 (citing *Williams v. Alioto*, 625 F.2d 845, 848 (9th Cir. 1980)).

5

6

(Dkt. No. 15 at 8 n.3 (footnote omitted).)  The Court reaffirms its previous legal conclusion. [2]

### B.    Claim for violation of mandatory duty

7

8

9

10

11

12

13

14

15

16

17

18

Plaintiffs allege that Defendants failed to perform various mandatory duties in violation of Cal. Gov't Code § 815.6, which essentially "applies to public entities the familiar rule of tort law that violation of a legislatively prescribed standard of care creates a rebuttable presumption of negligence." *Lehto v. City of Oxnard*, 171 Cal. App. 3d 285, 292 (Cal. Ct. App. 1985).  A claim for failure to perform a mandatory duty must satisfy three requirements: (1) the duty imposed by the subject enactment must be mandatory, not discretionary; (2) the enactment must be intended to protect against the risk of the kind of injury suffered by the plaintiff; and (3) the breach of the mandatory duty must be a proximate cause of the plaintiff's injury.  *See Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 498-500 (Cal. 2000).  In addition, it is well-settled that a claim under § 815.6 must allege a specific enactment that creates the mandatory duty.  *Lehto*, 171 Cal. App. 3d at 292-93 (1985); *see also Washington v. County of Contra Costa*, 38 Cal. App. 4th 890, 896-99 (Cal. Ct. App. 1995).

19

20

21

22

Plaintiffs allege that Defendants failed to perform a number of mandatory duties:

to advise that no permit was necessary for fencing or gates to grant the First Permit Application without imposing unlawful conditions, to refrain from issuing and recording an unlawful Notice of Violation against the Subject Property, to provide Petitions with notice and an opportunity to be heard before recording the Notice of Violation, and to expunge the unlawful Notice of Violation after it was recorded.

23

24

25

(SAC ¶ 71.)  Plaintiffs allege that each of these duties is found in one or more specific statutes or Constitutional clauses.  (SAC ¶¶ 72-81.)  Defendants argue that the statutes cited do not apply

26

27

28

---

[2]Because Defendants are entitled to summary judgment as to Plaintiffs' third claim on mootness grounds, the Court need not address Defendants' argument that Plaintiffs fail to state a claim upon which relief can be granted under Civil Code Section 3412.

15

to the facts in this case and that "[w]here Plaintiffs do cite an applicable statute, it is clear that the County complied with whatever mandatory duties it had in granting Plaintiffs' permits with conditions and in posting and recording the NOV." (Defs.' MSJ 19.)

While the SAC improves on Plaintiffs' previous pleadings by enumerating specific statutes that purportedly establish mandatory duties, Plaintiffs cannot rely upon their complaint alone to survive summary judgment. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 ("[Nonmoving party] cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."). Plaintiffs make no attempt to demonstrate that they can satisfy the three prongs of the test for a Section 815.6 claim, nor do they discuss any case law relevant to the section. Instead, they point to five legal questions and conclude that there is a triable issue of material fact with respect to their mandatory duty claim if the Court agrees with their position as to any one of those questions. (*See* Pls.' Opp. 31-32 ("Assuming arguendo that the court agrees with Plaintiffs' position on Issue No. 2, then Plaintiffs have a triable claim with respect to the allegations in paragraph [sic] 72 and 78 of [the SAC] that Title 24, California Building Codes §§ 105.2 and 312.1 barred [Defendants] from requiring a permit for fences not over six feet, and California Health and Safety Code §§ 18949.25-31 and 19870 requiring building officials to be licensed, certified and trained. . . . [U]nless the court agrees with defendants argument on Issue No. 2, then Plaintiffs have presented a triable issue of fact with respect to violation of Health and Safety Code §§ 17920.5 and 17920.6, Title 24, California Building Codes §§ 108.8.1-3 and related statutes as set forth in paragraph [sic] 73 and 74 of [the SAC]. . . . Unless the court accepts defendants' argument that [Santa Cruz County Code § 13.10.525(c)(3)] did not exempt Plaintiffs' hedge, there is a triable issue with respect to whether the County violated its mandatory duties as alleged in paragraph 72 of the complaint. . . . Unless the court agrees that defendants were perfectly within their rights in recording the red tag, there is a triable issue of fact as alleged in paragraph 79 of the complaint. . . . Unless the court agrees with defendants' position that there was no due process violation as a matter of law, there is a triable issue of fact with respect to violation of mandatory

duties as alleged in paragraph of the [SAC].").)

As pointed out by Defendants, "Plaintiffs appear to be arguing that if the Court finds that there is a triable issue of fact as to whether the County violated any statute, or engaged in any actionable conduct, that automatically creates a cause of action under section 815.6." (Defs'. MSJ Reply 6.)  This is insufficient to survive summary judgment, particularly where the requirements for a Section 815.6 claim are clearly established and, in fact, were stated in the Court's earlier order. *Gordon v. Vitumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) ("The 'party opposing summary judgment must direct [the court's] attention to specific, triable facts,' *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir.2003), and the reviewing court is 'not required to comb through the record to find some reason to deny a motion for summary judgment,' *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir.1988))."); *see* Dkt. No. 15 at 8-9.

## C.   Excessive and improper fees claim

Plaintiffs' fifth claim arises from Defendants' alleged imposition of "excessive, unreasonable, extortionate, collusive, and improper" fees in violation of the Due Process Clause, Cal. Gov't Code § 38773, et seq., Cal. Health & Safety Code § 17995, et seq., and the County's Uniform Fee Schedule.

Defendants contend that the fees were charged in accordance with the Uniform Fee Schedule and that they were reasonable.  Plaintiffs argue that the fee for the initial permit application was excessive because they were not required to apply for a permit at all.  Plaintiffs also claim that even if a permit were required, "their first application for a permit, which was charged as a $700 flat fee under the applicable fee schedule, should have sufficed." (Pls.' Opp. 33.)

Plaintiffs' argument amounts to this: the fees charged to them all were excessive because they were assessed as a result of improper actions by Defendants.  In the SAC, Plaintiffs assert their claim under the Due Process Clause, two state statutes, and the Defendants' own fee

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT
(JFLC3)

schedule.  In opposition to Defendants' motion, however, Plaintiffs concede that the $700 fee was charged according to the fee schedule and provide no authority for the proposition that wrongful imposition of a standard fee entitles them to a separate claim for excessive or improper fees under any statute or under the Due Process Clause.

**D.    Section 1983 claim**

"Section 1983 subjects any person who deprives someone of a constitutional right under color of state law to civil liability for that deprivation." *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996).  Plaintiffs' claim under 42 U.S.C. § 1983 alleges violations of their procedural and substantive due process rights, as well as their rights to equal protection of the laws.

**1.    Procedural due process**

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir.1998).  With respect to the first element, Defendants argue that Plaintiffs "had no vested right to maintain their oversight hedge as they had never legalized that use by obtaining a permit nor did any County planning regulation authorize the hedge without a permit."  (Defs.' MSJ 23.) Plaintiffs contend that even if the fence ordinance barred the hedge, "the County did not take action against the hedge, they posted a notice and recorded an encumbrance against the entire property," over which Plaintiffs had an ownership interest at the time.  (Pls.' Opp. 11.)

As to the second element, Plaintiffs contend that Defendants violated their procedural due process rights "at least four times over."  (Pls.' Opp. 12.)

**a.    Issuing the Notice of Violation**

Plaintiffs argue that Defendants constitutionally were required to provide "at least some type of notice and some type of hearing" before issuing the NOV.  Defendants assert that Plaintiffs' position "makes no sense whatsoever" because the NOV *is* a notice, and "[u]nder Plaintiffs' logic here, a suspect would presumably have a right to notice and a hearing *before* being arrested and brought to a magistrate to answer criminal charges."  (Defs.' Reply 10

(emphasis in original).)

Defendants are correct. There is no requirement that the County hold a hearing or issue "pre-notice notice." Plaintiffs' reliance upon *City of Oakland v. Abend*, No. C-07-2142 EMC, 2007 WL 2023506, at *6 (N.D. Cal. July 12, 2007), is misplaced. In that case, Judge Chen concluded that the Plaintiffs had "sufficiently alleged a constitutionally protected property interest which suffered a deprivation when the City issued the '30 Day Notice to Abate Letter'" where under the letter the Plaintiffs "were assessed a $3,000 nuisance case fee, which could be recovered through the property tax general levy, and additional substantial fines were threatened." *Abend*, 2007 WL 2023506, at *6.

*Abend* does not require the County to have provided process before issuing an NOV because, unlike the letter at issue in *Abend*, an NOV does not result in the automatic assessment of a fine, but provides instead that penalties may ensue if the violations are not corrected.

### b. Recording and/or failing to expunge the Notice of Violation

The County concedes that an NOV, "once recorded, is an impingement on property interests." (Defs.' Reply 11.) The parties dispute, however, whether the pre-impingement process was constitutionally adequate. The Supreme Court has established a set of factors for courts to determine what level of procedural protections are required in a particular case:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319 (1976).

Plaintiffs do not argue that the notice and protest meeting would have been insufficient under *Matthews*. Instead, they contend that the notice and opportunity to be heard in this case were nullified by the County's promise not to record the NOV while Plaintiffs pursued a permit and the County's subsequent undisclosed recordation of the document. Defendants claim that they met the requirements of due process by meeting with Plaintiffs and agreeing to a resolution,

and that Hart's "fail[ure] to ensure that the assigned code enforcement officer understood that the NOV was not supposed to be recorded" was "if anything . . . negligence, not a due process violation." (Defs.' Reply 12.)

Defendants contend that Plaintiffs were provided with due process before the recordation of the NOV even as they acknowledge that the protest meeting was abandoned in reliance upon the County's representation that the document would not be recorded. They maintain that the mistaken recordation of the NOV, while "preventable and certainly unfortunate," "cannot form the basis of a due process violation" because there is no evidence that supports the inference that "the red tag was recorded pursuant to a County policy to violate procedural due process." (Defs.' Reply 12.)

Plaintiffs reply that the evidence in the record demonstrates that the County acted in accordance with established policies (1) to issue NOVs without notice or hearing; (2) to record NOVs whenever there was no active protest on file even when the property owner had applied for a permit that would correct the violation; and (3) to issue a letter stating there had been a "follow up inspection" even when none had occurred. However, there is no evidence in the record that as a matter of policy the County deliberately induces property owners to end their protests in order to record NOVs without providing owners with an opportunity to be heard. At most, the evidence demonstrates that the employee who recorded the NOV in this case was unaware of the promise that had been made to Plaintiffs by Hart, the head of the Code Enforcement Section. The County's negligence in recording the NOV cannot support Plaintiffs' Section 1983 claim. *See, e.g.*, *Sorrels v. McKee*, 290 F.3d 965, 973 (9th Cir. 2002) ("[Government's failure to notify inmate of rejection of mail delivery] constitutes at most negligence and does not state a due process violation under § 1983.").[3]

At the same time, however, Defendants do not attempt to justify the County's failure to

_____

[3]Plaintiffs also argue that "a triable issue exists that the recordation was the result of political pressure" from Zscheile on the County. (Pls.' Opp. 15.) This argument refers to and echoes Plaintiffs' argument with respect to the permitting process and is addressed below in Section III.D.1.d.

20

1  correct the error for a period of fourteen months even though Plaintiffs subsequently brought the

2  error to their attention.  Under the circumstances, Defendants' failure or refusal to correct their

3  mistake over a period of that length is sufficient to raise a triable issue of fact as to whether

4  Defendants' conduct was intentional.  Accordingly, Plaintiffs' Section 1983 claim, limited to the

5  Defendants' failure to expunge the recorded NOV, survives summary judgment.

6  **c.     Post-Recordation Process**

7  Without citation to authority or further argument, Plaintiffs argue that "[t]here was no

8  available post-deprivation procedure [with respect to the NOV].  County Code § 19.01.080

9  explicitly states that recordation of a red tag is 'final and not subject to further appeal.'" (Pls.'

10  Opp. 16.)  As just discussed, Plaintiffs' due process rights were violated, if at all, by the failure

11  to expunge the red tag.  The absence of post-recordation appellate procedures is not a basis for a

12  separate claim.

13  **d.     The Permitting Process**

14  Plaintiffs make three separate arguments as to how their procedural due process rights

15  were violated during the permitting process that continued after the recordation of the NOV.

16  First, they contend that their due process rights were violated when Fitzpatrick, the enforcement

17  officer who recorded the NOV, "personally participated in the decision to deny Plaintiffs' appeal

18  to legalize the hedges" by sending an email to Daly suggesting that she deny the application.

19  Defendants contend that this was not a violation because Daly testified that she ignored the

20  email and never denied the permit.  The Court agrees with Defendants' argument that

21  Fitzpatrick's single email regarding the appeal does not demonstrate that he "participated" in the

22  permit decision–particularly where the ultimate decision-maker testified that she ignored his

23  suggestion and, more importantly, where that suggestion was not followed.

24  Second, Plaintiffs argue that Burns failed to hear any of their evidence before announcing

25  his decision on their appeal.  Defendants claim that this is incorrect because "Plaintiffs withdrew

26  DPA-05780 [sic] and did not appeal the second decision on DPA 07-0327.  They appealed the

27  first decision on DPA 07-0327.  Burns heard the appeal through his designee (Bussey) and

28

21

1    remanded the application to staff for further analysis."  (Defs.' Reply 13.)

2        Plaintiffs rely on an email from Burns to their consultant, Laughlin.  The email does not

3    "announce his decision," but implies an intended decision, ending with: "[I]t appears to me that

4    they will not get a permit.  If there's something that I've missed, please let me know."  (Oracle

5    Decl. Ex. H.)  This does not show that Burns announced his decision without hearing Plaintiffs'

6    evidence, but summarizes his preliminary review of the appeal.

7        Third, Plaintiffs contend that Supervisor Pirie "improperly interfered with the process."

8    (Pls.' Opp. 17.)  Plaintiffs point to evidence in the record that: Zscheile sent letters to Pirie

9    before Fitzpatrick posted the red flag; Pirie did not tell Plaintiffs she was helping Zscheile; Pirie

10   and her staff received computer data about permit applications in the district; Pirie discussed

11   Plaintiffs' permit application with Keyon; Keyon knew Pirie had received complaints from

12   neighbors about Plaintiffs' hedges; and Burns asked Keyon for status updates to report back to

13   Pirie.  Plaintiffs argue that this evidence and evidence that Pirie spoke to County Administrator

14   Susan Mauriello to ensure Zscheile's complaints were reviewed, create a triable issue "as to

15   whether the process was tainted by political interference."  (*Id.* at 18.)

16       Defendants argue that despite this evidence or that Pirie was aware of the situation, "there

17   is no evidence that Supervisor Pirie influenced decisions made by staff in the permitting process

18   or instructed staff to place certain conditions on the permits that were granted."  (Defs.' Reply

19   13.)  They assert that her communication with her constituents is consistent with her role as

20   supervisor and "does not establish a due process violation in the permitting process."  (*Id.*)

21       Plaintiffs' evidence related to Pirie shows that the supervisor: received complaints from a

22   constituent, spoke with Plaintiffs, received information regarding permit applications, and

23   requested information from and discussed Plaintiffs' permit application with County employees.

24   None of this evidence supports a reasonable inference either that Pirie's actions were

25   inconsistent with her duties as an elected official or that her involvement was improper or

26   contributed to any unfairness or denial of due process.

27

28

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT
(JFLC3)

2.     **Substantive Due Process**

"A substantive due process claim does not require proof that all use of the property has been denied, *Herrington v. County of Sonoma*, 834 F.2d 1488, 1498 (9th Cir. 1988), but rather that the interference with property rights was irrational or arbitrary." *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988.)  Plaintiffs argue that the County's actions with respect to Plaintiffs' hedge and permit applications were "irrational or arbitrary."  Their argument, however, consists of demonstrating that there were differences of opinion among County employees as to the danger the hedges posed and the appropriate setback that should have been ordered.

Plaintiffs' evidence may be sufficient to show a triable issue of fact as to the validity of the safety concerns of those County employees who advocated setting back the hedge. However, Plaintiffs have not demonstrated that there are issues of fact as to whether those employees acted irrationally or arbitrarily.  Proving error is not the same as proving that officials abandoned their obligation to perform their duties at all, which essentially is the standard for a substantive due process claim.

3.     **Equal Protection**

"[Z]oning and land use issues do not implicate fundamental rights."  *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994) (citation omitted).   Plaintiffs do not contend that they were discriminated against on the basis of their race, gender, ethnicity, or some other suspect classification.  In order to establish an equal protection violation as a result of a land use decision in the absence of a suspect classification, Plaintiffs must prove that their property "has been treated differently from similarly situated property and whether there is any rational basis for such treatment."  *Kawaoka*, 17 F.3d at 1240.

a.     **Differential treatment**

Plaintiffs argue that Defendants did not enforce the fence ordinance against similarly situated neighbors.  In support, they submit pictures of the area surrounding their former home that show hedges in excess of three feet as well.  (Dkt. No. 46-1 at 2-14.)  Plaintiffs also point to

a section of in the report signed by Keyon and Deming approving Plaintiffs' Application Number 07-0327 in which the County officials noted that the surrounding neighborhood featured "many fences and hedges between three and six feet in height . . . within the front yard setback (and in many cases the right of way)." (Dkt. No. 46-2 at 6.)

Defendants contend that the pictures Plaintiffs submit do not establish that other property owners were similarly situated because Plaintiffs present "no evidence that any of [the other] hedges abutted a deep curve in the road or presented similar safety issues to Plaintiffs' hedge, or that neighbors complained about the safety of those hedges." (Defs.' MSJ Reply 9.)

Although Plaintiffs did not submit evidence of a property identical to their own with respect to potential safety issues, the Court concludes that the pictures of other roadside hedges in the neighborhood obscuring driveways and on curved roads may be sufficient to establish a triable issue of fact as to differential treatment of similarly situated properties. The Court thus must address whether there was a rational basis for this disparity.

### b. Rational basis

The Ninth Circuit has held that if courts "find that the rational relation of the zoning actions to legitimate governmental interests is *at least fairly debatable*, the action must be upheld." *Nelson v. City of Selma*, 881 F.2d 836, 839 (9th Cir. 1989) (emphasis added). However, the "rational relation test will not sustain conduct by state officials that is malicious, irrational, or plainly arbitrary." *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990).

Plaintiffs contend that the record contains "overwhelming evidence that the County's safety rationale was frivolous and deceitful." (Pls.' Opp. 21.) Specifically, Plaintiffs point to Fitzpatrick's "improper emails" and also claim that their neighbor, Zscheile, "seems to have been pulling the strings." (*Id.* at 22.) In addition, Plaintiffs refer to case law establishing that "[o]n summary judgment, an equal protection plaintiff may show pretext by creating a triable issue of fact that either: (1) the proffered rational basis was objectively false; or (2) the defendant actually acted based on an improper motive." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 945-46 (9th Cir. 2004).

1  Defendants argue that "[t]he evidence clearly shows that several County employees were
2  concerned about the safety of the hedge and sought to alleviate those concerns." (Defs.' MSJ
3  Reply 9.) They contend that the fact that some other County employees, and Plaintiffs'
4  consultant, may have believed differently is irrelevant for equal protection purposes. They also
5  claim that Fitzpatrick's "admittedly inappropriate" emails are insufficient to create a triable
6  issue as to whether the County's actions were "malicious, irrational, or plainly arbitrary,"
7  because "the evidence shows that they did not impact any decision that was made in this case."
8  (*Id.* at 10.)

9  The Court concludes that Plaintiffs have failed to show that there are triable issues of fact
10 as to whether the County's actions were "malicious, irrational, or plainly arbitrary." While
11 Fitzpatrick's emails admittedly were inappropriate, Plaintiffs have provided no evidence
12 demonstrating that the County's actions toward Plaintiffs and their property were impacted by
13 his emails or the feelings conveyed in them. Moreover, the evidence concerning the officials'
14 differences of opinion regarding the safety hazards of Plaintiffs' hedges and fence does not
15 demonstrate that the County's proffered safety concerns were "objectively false," or that the
16 rational relationship between the zoning actions and the safety interest was not "at least fairly
17 debatable."

18 **E.    Inverse condemnation claim**

19 Plaintiffs' seventh claim alleges violation of the state and federal constitutional
20 prohibitions on takings without just compensation. Plaintiffs argue that Defendants' recordation
21 of the NOV was a wrongful taking, even if unintentional, and that they suffered damages as a
22 result of their inability to sell their home following the recordation. They rely upon the
23 deposition testimony of Lyng, their realtor, for the proposition that the property "became
24 unsalable shortly after it was put on the market because of the recordation of the red flag." (Pls.'
25 Opp. 34.)

26 Plaintiffs bear the burden of proving that the County has taken or damaged their property
27 without compensation. *Dina v. People ex rel. Dep't of Transp.*, 151 Cal. App. 4th 1029, 1048

28

25

(Cal. Ct. App. 2008).   As Defendants correctly argue in their moving papers, inverse condemnation claims predicated on alleged temporary "regulatory takings" are governed by the United States Supreme Court's holding in *Pennsylvania Central Transportation Company v. New York City*, 438 U.S. 104 (1978) ("*Penn Central*").  *See also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005); *Shaw v. County of Santa Cruz*, 170 Cal.App.4th 229 (Cal. Ct. App. 2008). As the California Court of Appeal held in *Shaw*, the *Penn Central* analysis is:

> an essentially "ad hoc" inquiry mostly focusing on three factual inquiries that probe the severity of the burden imposed on private property rights and the extent to which the claimant has been unfairly forced to bear a public burden. (*Penn Central*, *supra*, 438 U.S. at p. 124, 98 S.Ct. 2646; *Lingle*, *supra*, 544 U.S. at p. 539, 125 S.Ct. 2074; [citation omitted].)  These are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the government action, i.e., did it involve a physical invasion or merely a regulation adjusting societal burdens and benefits to promote the public good. (*Penn Central*, *supra*. at p. 124, 98 S.Ct. 2646; *Lingle*, *supra*, 544 U.S. at p. 539, 125 S.Ct. 2074; [citation omitted].)  This analysis turns in large part on "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." (*Lingle*, *supra*, 544 U.S. at pp. 539-540, 125 S.Ct. 2074.) Although the *Penn Central* factors do not serve as a checklist, a court may dispose of a takings claim on the basis of one or two of them. (*Allegretti* [*& Co. v. County of Imperial*], *supra*, 138 Cal.App.4th at p. 1277, 42 Cal.Rptr.3d 122 and cases cited there; *Ruckelshaus v. Monsanto Co.* (1984) 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 [disposing of takings claim solely on absence of reasonable investment-backed expectations].)

*Shaw*, 170 Cal. App. 4th at 271-72.

Despite Defendants' direct reference to *Penn Central*, Plaintiffs fail either to address the *Penn Central* factors or to argue persuasively that they are inapplicable.  Moreover, the evidence in the record demonstrates clearly that the recordation of the NOV was not a taking.  With respect to the first and second *Penn Central* factors, Plaintiffs present only the speculative opinion testimony of their realtor, who could not identify either one firm offer before the recordation or one potential buyer who refused to buy because of the recordation,  Lyng Dep. 95:9-96:14, and evidence that the value of the property declined between the October 2008 and the fall of 2009.   This hardly establishes a genuine issue of material fact as to whether the economic impact *of the recordation* (as opposed to the severe decline of the real estate market) was significant or whether any expectations Plaintiffs had were either distinct or investment-

26

backed.  As to the third factor, the County did not physically invade Plaintiffs' property.

Plaintiffs thus have failed to show that there are triable issues of fact as to their seventh claim.

**F.   Declaratory and injunctive relief**

In their eighth claim, Plaintiffs seek declaratory relief with respect to permit requirements

and fee collection.  (SAC ¶¶ 105-106.)  In their ninth claim, Plaintiffs seek the following order

"on behalf of themselves and other [sic] similarly situated" broadly enjoining Defendants as

follows:

> a.    Enjoining recordation of Notices of Violation against real property.
>
> b.    Requiring [Defendants] to give parties challenging a Notice of Violation a hearing pursuant to County Code § 1.12.070, the Uniform Building Code and the Health and Safety Code.
>
> c.    Requiring [Defendants] to provide for a housing appeals board or local appeals board comprised of qualified, experienced persons who are *not* employees of [Defendants], with all appeals to be heard without charges and give citizens two years or other applicable periods from State law (rather than the inapplicable 90 days limit of Santa Cruz County Code § 1.05.050) to request a hearing.
>
> d.    Expunging all recorded notices of violation that have been recorded in Santa Cruz County.
>
> e.    Requiring Respondents to apply Uniform Building Code § 108.8, including § 108.8.3, to notify County citizens of the right to appeal, and to authorize the applicable boards to apply State building codes when they are in conflict with County regulations.

(SAC ¶ 111 (emphasis in original).)

Defendants argue that Plaintiffs' eighth and ninth claims should be dismissed as moot

because Plaintiffs have sold the property and the NOV has been expunged.  Plaintiffs contend

that even though their personal "need for declaratory and injunctive relief has lessened in light

of their having sold their property, they certainly may return from New Zealand at some point

and are concerned that others who are similarly situated, and do not have the means to litigate

the issues against the County."  (Pls.' Opp. 35.)  They urge the Court to consider their claims

"even if they are in some sense moot" under the "capable of repetition, yet evading review" or

"voluntary cessation" doctrines as exceptions to the mootness doctrine.  (*Id.*)

Plaintiffs' arguments are unpersuasive.  Although Plaintiffs allege that they seek

27

Case No. C 09-373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(JFLC3)

1  injunctive relief "on behalf of themselves and other [sic] similarly situated," they have never
2  sought to bring this case as a class action.  Though they may be correct that the chances are
3  small that another individual with "both the wherewithal and the motivation to challenge the
4  fence ordinance, permit and red tag procedures" will do so, this is an insufficient ground for the
5  Court to consider Plaintiffs' eighth and ninth claims.  *See, e.g.*, *West Linn Corporate Park*
6  *L.L.C. v. City of West Linn*, 534 F.3d 1091, 1099 (9th Cir. 2008) ("Article III of the Constitution
7  limits the jurisdiction of federal courts to consideration of actual cases and controversies, and
8  federal courts are not permitted to render advisory opinions.")

9         Moreover, neither the "capable of repetition, yet evading review" doctrine nor the
10  "voluntary cessation" doctrine applies here.  "[T]he capable-of-repetition doctrine applies only
11  in exceptional situations, and generally only where the named plaintiff can make a reasonable
12  showing that he will again be subjected to the alleged illegality."  *City of Los Angeles v. Lyons*,
13  461 U.S. 95, 109 (1983) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 319 (1974)).  In *Lyons*, the
14  plaintiff requested that the district court bar the Los Angeles Police Department from using
15  "chokeholds."  *Id.* at 97.  The Supreme Court held that the district court's dismissal of the
16  plaintiff's claim for injunctive relief was correct where he did not provide any evidence tending
17  to show that he "faced a real and immediate threat of again being illegally choked."  *Id.* at 110.
18  Similarly here, Plaintiffs have not provided any evidence to support the conclusion that they face
19  any future threat of the violations they allegedly suffered with respect to the property in
20  question.  Plaintiffs' representation that they "certainly may return from New Zealand at some
21  point" clearly is insufficient.  (Pls.' Opp. 35.)

22          The "voluntary cessation" doctrine may have saved Plaintiffs' claims from dismissal
23  before the sale of the property.  (*See* Dkt. 15 at 8.)  However, Plaintiffs' eighth and ninth claims
24  are mooted not by Defendants' cessation of their allegedly illegal conduct but by the Plaintiffs'
25  sale of their home and, with it, their right to seek injunctive and declaratory relief.

26                                   **V. CONCLUSION**

27         For the foregoing reasons, Defendants' motion for summary judgment is granted, except

28                                          28

1   as to Plaintiffs' Section 1983 claim for violation of their procedural due process rights in

2   connection with Defendants' failure to expunge the NOV.[4]

3

4   **IT IS SO ORDERED**

5   DATED: 5/4/10

6                                                    _____
                                                     JEREMY FOGEL
7                                                    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21
    _____

22      [4]On March 29, 2010, Plaintiffs filed objections to several sections of the declarations of
    Burns, Deming, and Thomas Jacobson.  Plaintiffs' objections with respect to all of the
23  challenged portions of Jacobson's and Deming's declarations and paragraphs 3, 4, 6, and the
    challenged portion of paragraph 11 of Burns' declaration are overruled as moot, as resolution of
24  Defendants' motion did not require the Court to consider any of the challenged evidence.   With
    respect to paragraph 2 and Exhibit A of Burns' declaration, Plaintiffs' objections are overruled
25  on the grounds that: (1) the report is a public record (2) Burns has sufficient personal knowledge
    to make and provide foundation for the statements in the report relevant to resolution of the
26  instant motion; and (3) none of the statements relevant to the disposition of the motion
27  constitutes a legal opinion or conclusion.

28
                                             29