1

2

3

4

5

6

7

8

9

10

11

12

**E-Filed 10/6/10**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

13

14

15

16

17

18

19

20

21

ELAN and REVEREND ORACLE,

                Plaintiffs,

    v.

SANTA CRUZ COUNTY PLANNING
DEPARTMENT; TOM BURNS; SANTA CRUZ
COUNTY; ELLEN PIRIE; JAN BEAUTZ; NEAL
COONERTY; TONY CAMPOS; and MARK W.
STONE,

                Defendants.

Case No. 5: 09-cv-00373 JF (PVT)

**ORDER[1] (1) GRANTING IN PART
AND DENYING IN PART MOTION
FOR RECONSIDERATION AND (2)
GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

[Docket No. 59]

22

23

24

25

26

       Plaintiffs Elan and Reverend Oracle ("Plaintiffs") seek reconsideration of the Court's

order of May 4, 2010, granting in part and denying in part the motion for summary judgment

brought by Defendants Santa Cruz County (the "County"), Santa Cruz Planning Department,

Tom Burns, Ellen Pirie, Jan Beautz, Neal Coonerty, Tony Campos, and Mark Stone

(collectively, "Defendants").  On September 1, 2010, the Court granted Plaintiffs leave to seek

27

28

      [1] This disposition is not designated for publication in the official reports.

reconsideration with respect to two issues: (1) whether Plaintiffs' evidence is sufficient to raise a triable issue of fact as to whether that Defendants' actions were arbitrary and capricious, and (2) whether Plaintiffs' constitutional rights were violated at the time of the initial recordation of the notice of violation ("NOV"). In the event that the motion is granted with respect to either issue, Defendants request that the Court reexamine two other issues that previously were deemed moot. The Court has considered the moving and responding papers, and for the reasons discussed below, the order dated May 4, 2010 will be modified as set forth herein.

## I. BACKGROUND

### A. Factual background

The factual background of this case was detailed extensively in the Court's earlier order, (Docket No. 56), and for the sake of brevity only the basic relevant facts are recounted here. Plaintiffs owned property located at 396 Tolak Road in Aptos, California. That location is zoned for "residential agriculture." The perimeter of the property facing the road features pittasporum hedges, which by 2005 had grown naturally to eight to ten feet in height. In December 2005, Plaintiffs filed Development Permit Application ("DPA") 05-0780 for two circular driveway gates and a black vinyl chain-link fence to separate the front of their property from Tolak Road and Horizon Way. On May 3, 2006, the County approved DPA 05-0780 with the condition that Plaintiffs lower the height of the hedge abutting the road to three feet at certain locations along the perimeter of the proposed fence. Plaintiffs accepted the conditional permit, though they have stated that they were not aware of the conditions at the time of their acceptance.

Throughout this period, Plaintiffs' neighbors complained to the County about the hedge, alleging that the height of the hedge created a safety hazard for people traveling on the road. In August 2006, Code Compliance Investigator Kevin Fitzpatrick ("Fitzpatrick") conducted a site inspection of the property. He determined that the hedge violated County Code Section 13.10.525(c)(2), which provides that a hedge may not "exceed three feet in height if located in a front yard or other yard abutting a street." At the same time, Fitzpatrick concluded that there was no actual sight-line issue associated with the hedge. In November 2006, David Keyon

("Keyon"), the staff planner assigned to DPA 05-0780, sent a letter to Plaintiffs notifying them that they were in violation of the conditions required for the permit, and that failure to comply with the conditions would result in adverse action. Plaintiffs withdrew DPA 05-0780, seeking to avoid the conditions. Nonetheless, after being directed to do so by a supervisor, Fitzpatrick posted a NOV, or "red tag," on Plaintiffs' property because of the violation of § 13.10.525(c)(2). On February 6, 2007, the County sent Plaintiffs a letter notifying them that it intended to record the NOV if the violation was not corrected within thirty days. Plaintiffs requested a "protest meeting" to challenge the NOV. At Plaintiffs' request, the protest meeting subsequently was postponed because of Plaintiffs' desire to re-enter the permitting process.

On June 4, 2007, Plaintiffs meet with Keyon, Code Enforcement Supervisor Ken Hart ("Hart"), and Assistant Planning Director Mark Deming ("Deming"). At the meeting, Hart represented to Plaintiffs that the County would not record the NOV while Plaintiffs were engaged in the permit process. In reliance on this promise, Plaintiffs withdrew their request for a protest meeting concerning the NOV. Keyon and Deming thereafter conducted a site inspection to review the line of sight around Plaintiffs' hedge. Following this inspection, Keyon represented in an email to Plaintiffs' representative that a permit could be issued if Plaintiffs moved the hedge five feet back from the road and cut it down to six feet in height.

Plaintiffs complied with Keyon's recommendation, and on June 28, 2007, they filed their second Development Permit Application – DPA 07-0327 – again seeking to construct a six-foot high chain-link perimeter fence with two gates. Despite Keyon's prior email, Deming determined that in order to provide sufficient sight-lines around the curve, the hedge could not remain at six feet in height at its current location because, in his opinion, it created a serious sight distance problem. On August 10, 2007, the County approved DPA 07-0327, on the condition that Plaintiffs trim their hedge as set forth in the Staff Report accompanying the permit, requiring Plaintiffs to trim and relocate the hedge. On August 24, 2007, Plaintiffs appealed the conditions of DPA 07-0327, specifically those involving further trimming of the vegetation.

On or about August 28, 2007, Code Enforcement Officer Laura Madrigal ("Madrigal")

3

received notice from Katrina Hughes, a clerical employee, that Plaintiffs' code violation had not been resolved.  Madrigal did not know that Hart had told Plaintiffs that the NOV would not be recorded while they were engaged in the permit process, and she recorded the NOV based on her standard practice.  Hart concedes that the NOV was recorded in error.  Plaintiffs immediately requested that Defendants expunge the NOV, but Defendants did not comply with these requests until October 2008.

On October 4, 2007, the Planning Director's designee, Don Bussey, issued a decision concerning Plaintiffs' appeal of the condition that they trim their hedge.  Bussey nullified the approval of the permit with conditions and remanded the project to staff to consider new sight distance information from Plaintiffs' traffic engineer, Ron Marquez ("Marquez").  Marquez opined that based on his calculations, a hedge six feet in height did not create a safety hazard. County Project Planner Alice Daly ("Daly") reconsidered Plaintiffs' application after the appeal, taking into account the additional information from Marquez, her own site inspection, and her discussions with Deming.

Plaintiffs were unsuccessful in scheduling an in-person meeting with Daly, but they did communicate with her via email.  Plaintiffs also copied Fitzpatrick on these emails.  On February 8, 2008, in response to one of the e-mails, Fitzpatrick wrote to Daly: "Alice, this violation has been recorded on title and code compliance will not be taking any action. Can you just deny their application and let them appeal your decision. [sic] all [sic] this crap is not worth your time."  During the course of these email communications, Plaintiff Reverend Oracle indicated that she held three minister licenses, to which Fitzpatrick responded, "would they be minister licenses of Babylon the Great" [sic].

Daly testified that in making her decision on Plaintiffs' application, she was "relying" on Marquez's measurements for line of sight distances and was "trying to apply what [Marquez] had identified as what should be the adequate line-of-sight areas."  Nonetheless, on April 1, 2008, the County issued an Amended Staff Report and Development Permit for Permit No. 07-0327, approving a six-foot fence around the perimeter of Plaintiffs' property, requiring an eight-foot setback, and outlining areas where the hedge could not exceed three feet in height.

4

Plaintiffs did not appeal that decision, instead filing suit against Defendants in the Santa Cruz Superior Court.  The action subsequently was removed to this court, and in October 2008, Defendants expunged the NOV and issued a revised permit allowing Plaintiffs to maintain a hedge six feet in height.  Plaintiffs sold the property in the fall of 2009.

**B.    Order dated May 4, 2010**

In its order dated May 4, 2010, the Court concluded in relevant part that Plaintiffs' evidence is insufficient to show that Defendants' actions were arbitrary and capricious, or that Plaintiffs' constitutional rights were violated by the initial recordation of the NOV.  The Court determined that, viewed in the light most favorable to Plaintiffs, the evidence supported an inference only that Defendants may have erred in concluding that there was a safety issue and that "there were differences of opinion among County employees as to the danger the hedges posed and the appropriate setback that should have been ordered."  (Docket 56 at 23:7-9.)  Plaintiffs note correctly in their motion for reconsideration that the order did not discuss Daly's treatment of Marquez's engineering data.  With respect to the recording of the NOV, the Court found that the evidence supported an inference only that the County acted negligently, and it relied upon Ninth Circuit authority holding that negligence is an insufficient basis for a § 1983 claim.  *See, e.g.*, *Sorrels v. McKee*, 290 F.3d 965, 973 (9th Cir. 2002) ("[The government's failure to notify an inmate of the rejection of mail delivery] constitutes at most negligence and does not state a due process violation under § 1983.").  Plaintiffs argue that while the actual recordation of the NOV may have been negligent, the action that led to the recordation was intentional and thus is a potential basis for § 1983 liability.  Although not all of Plaintiffs' contentions are persuasive, the Count concludes hat Plaintiffs' ultimately are correct as to both points.

## II.  DISCUSSION

**A.    Whether the evidence is sufficient to support an inference that Defendants' actions were arbitrary and capricious**

Plaintiffs contend that two events demonstrate sufficiently that Defendants' actions were arbitrary and capricious: (1) Keyon's initial indication that Plaintiffs' hedge was acceptable if it

5

1   was set back five feet and cut down to six feet in height (which was inconsistent with his

2   subsequent report requiring that the hedge be cut down to three feet in height at certain

3   locations) and (2) Daly's decision requiring a set-back of eight feet and a maximum hedge

4   height of three feet in some locations, despite her claim that she was applying and relying upon

5   Marquez's engineering data (which was inconsistent with her conclusions).

6   **1.   Keyon's decisions**

7   In an email dated June 7, 2007, Keyon told Plaintiffs that they would receive approval for

8   their fence and hedge if the hedge was cut down to six feet in height and set back five feet.

9   (Pierce Decl. Ex. C, Deposition Ex. 27.)  However, when Keyon formally approved DPA 07-

10  0327, the approval was conditioned on the requirement that the hedge be cut down to three feet

11  at certain points.  (*See* Pierce Decl. Ex. C, Deposition Ex. 30.)  Relying upon *Del Monte Dunes*

12  *v. Monterey*, 920 F.2d 1496, 1506 (9th Cir. 1990) and *Bateson v. Geisse*, 857 F.2d 1300, 1303

13  (9th Cir. 1988), Plaintiffs argue that this change of positions was arbitrary and capricious.  In

14  *Del Monte Dunes*, "[t]he appellants spent over 18 months preparing a plan to meet the

15  conditions specified [by the city council]. The plan was approved in the architectural review,

16  was recommended by the City's professional planning staff, and then the same three members of

17  the city council that had approved the development with certain conditions abruptly changed

18  course and disapproved the plan even though the conditions specified had been substantially

19  met." *Del Monte Dunes*, 920 F.2d at 1506.  The Ninth Circuit concluded that the appellants

20  adequately had alleged arbitrary and irrational behavior. *Id.* at 1508.  In *Bateson*, the relevant

21  regulations provided that "the building official *must* issue a building permit" if the proposed

22  building plan complied with the building code and other applicable laws. *Bateson*, 857 F.2d at

23  1303 (emphasis in the original).  Despite the fact that the relevant regulations did not allow for

24  city council review before a building permit could issue, the council voted to withhold a

25  building permit. *Id.*  The Ninth Circuit concluded that this amounted to "arbitrary

26  administration of the local regulations." *Id.*

27  Here, however, the record supports an inference only that Keyon disagreed with Deming

28  over the safety implications of Plaintiffs' hedge.  Shortly after conducting an on-site inspection

6

of Plaintiffs' property, Keyon indicated in an email to Plaintiffs that he and Deming believed that a permit could issue if the hedge was set back five feet and cut down to six feet in height. (Pierce Decl. Ex. C, Deposition Ex. 29.)  When asked if Keyon had "jumped the gun," Deming answered "yes." (Pierce Decl. Ex. C at 41:3-8.)  He stated that at the time of Keyon's email to Plaintiffs, he "hadn't had the chance yet to sit down with the set of plans and figure out what the sight distances were."  (Pierce Decl. Ex. C at 40:23-24.)  Deming also stated that he believed that he possessed "better experience and knowledge" than Keyon. (*Id.* at 57:14-15.)  Rather than suggesting an arbitrary and irrational reversal of opinion as in *Del Monte Dunes*, the record supports an inference only that Deming disagreed with Keyon's earlier assessment and that Keyon's final decision reflected Deming's concerns. *Bateson* also is distinguishable.  In that case, the relevant authority was required to issue a permit if certain conditions were met. *Bateson*, 857 F.2d at 1303.  In this instance, Plaintiffs have not demonstrated that approval of a six-foot hedge with a five-foot set-back was mandatory pursuant to the County's regulations.

**2.     Daly's decision**

In reaching her conclusions with respect to application DPA 07-0327, Daly testified that she was "relying on his [Marquez's] information," (Docket No. 49, Ex. B at 88:25), that she "saw no reason why [she] could not or should not rely on his [Marquez's] evaluation of things," (*id.* at 90:11-12), and that she "was trying to apply what Ron Marquez had identified as what should be the adequate line-of-sight areas," (*id* at 111:24-112:1).  Daly testified that she was attempting to make use of Marquez's data through the County's Geographic Information System. (*Id* at 87:15-18; 111:24-112:13; 115:2-4).  However, Daly reached a very different conclusion than Marquez.  Although Marquez had concluded that adequate lines-of-sight were present with a hedge set back five feet and no more than six feet in height, (Docket No. 48 at ¶ 8), Daly concluded that the hedge needed to be set back between eight and ten feet and be no more than three feet in height at certain locations.  (*See* Docket No. 49, Ex. B at 110:16-21.)  The Court concludes – at least for purposes of a motion for summary judgment – that Daly either should have realized that she had used Marquez's data incorrectly or should have been able to articulate how and where her analysis differed from that of Marquez.  The record lacks

7

1    any testimony from Daly indicating the point at which she disagreed with or departed from

2    Marquez's evaluation, and a reasonable fact-finder could infer Daly submitted her conditional

3    approval of application DPA 07-0327 without attempting to understand and correct the source

4    of any potential error in her use of Marquez's data.  Viewed in the light most favorable to

5    Plaintiffs, the evidence supports an inference that Daly acted irrationally and "abandoned" her

6    obligation to perform her duty to evaluate Plaintiffs' application properly.

7         In its order dated May 4, 2010, the Court noted that the standard for a substantive due

8    process claim "essentially" is "that officials abandoned their obligation to perform their duties at

9    all . . . ."  (Docket 56 at 23:13-15.)  With respect to Plaintiffs' equal protection claim, the Ninth

10   Circuit has held that the government's action "must be upheld" if "the rational relation of the

11   zoning actions to legitimate governmental interests is at least fairly debatable . . . ."  *Nelson v.*

12   *City of Selma*, 881 F.2d 836, 839 (9th Cir. 1989).  However, the "rational relation test will not

13   sustain conduct by state officials that is malicious, irrational, or plainly arbitrary."  *Lockary v.*

14   *Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990).  The Court granted Defendants' motion for

15   summary judgment with respect to Plaintiffs' substantive due process and equal protection

16   claims because Plaintiffs had not shown a triable issue of material fact with respect to whether

17   the County's actions were "malicious, irrational, or plainly arbitrary."  Upon reconsideration of

18   the evidence as to Daly, the Court concludes that both claims should survive summary

19   judgment.

20   **B.     Whether Plaintiffs' procedural due process rights were violated at the time of the**

21   **        initial recordation of the NOV**

22        In its order dated May 4, 2010, while determining that Plaintiffs could proceed on their

23   claim that Defendants violated Plaintiffs' right to procedural due process by failing to remove

24   the NOV after it was recorded, the Court dismissed Plaintiffs' claim that Defendants violated

25   their procedural due process rights by recording the NOV in the first instance.  The Court

26   reasoned that the recordation of the NOV was negligent and noted that negligence alone cannot

27   support a §1983 claim.  (Docket No. 56 at 20:20-23.)  Relying upon case authority not presented

28   in their papers in opposition to Defendants' motion for summary judgment, Plaintiffs now argue

8

that the Court erred by not drawing a distinction between negligent conduct that causes a deprivation of due process and intentional acts that lead to a negligent deprivation of due process. Plaintiffs also contend that the evidence supports an inference that Hart acted with "deliberate indifference" rather than with negligence.

### 1. Supreme Court precedent with respect to the interplay between negligent conduct and § 1983 claims

In *Daniels v. Williams*, 474 U.S. 327, 328 (1986), an inmate at a correctional facility claimed to have suffered injuries as a result of slipping on a pillow that negligently was left on a staircase by a correctional deputy. The Supreme Court concluded that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Id.* Plaintiffs contend that the instant case is distinguishable from *Daniels* because Defendants *intended* to cause injury to their property – i.e., Madrigal intended to record the NOV – and that it is irrelevant whether the resulting deprivation of due process was without fault.

Plaintiffs claim that the instant case is similar to *Wolff v. McDonnell*, 418 U.S. 539, 560 (1974), in which the Supreme Court held that a prisoner could not be deprived of "good-time credits" without being provided certain procedures consistent with due process. Commenting on *Wolff*, the Supreme Court in *Daniels* noted that "[w]e think the relevant action of the prison officials in that situation is their deliberate decision to deprive the inmate of good-time credit, not their hypothetically negligent failure to accord him the procedural protections of the Due Process Clause." *Daniels*, 474 U.S. at 333-334. In *Wolff*, the prison officials intended to deprive the inmate of "good-time" and to provide procedures that subsequently were determined to be constitutionally deficient. 418 U.S. at 558-59. However, there was no evidence that the prison officials intentionally provided deficient procedures, and in that sense, the actual failure to provide due process was without fault. The Supreme Court concluded that the prison officials still could be liable for the intentional deprivation of McDonnell's "good time" credits. *Id.* at 559.

Defendants argue that the instant case is more similar to *Hudson v. Palmer*, 468 U.S. 517,

533 (1984), in which the Supreme Court held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *See also Bretz v. Kelman*, 773 F.2d 1026, 1030 (9th Cir. 1985) (citing *Hudson* for the proposition that § 1983 actions may be appropriate for "situations involving intentional, but random and unauthorized deprivations of property by state officials," but "only if the state had effectively denied the plaintiff a meaningful postdeprivation remedy in state courts.") In *Hudson*, a prisoner alleged that a prison guard intentionally destroyed the prisoner's property during a search of the prison cell. 468 U.S. at 405-06. The alleged destruction of property was unauthorized in that it was not part of an established state procedure.

*Hudson* was an extension of *Parratt v. Taylor*, 451 U.S. 527, 541 (1981). *Parratt* held that an unintentional deprivation of property could be a constitutional violation if the state did not provide a meaningful postdeprivation remedy. 451 U.S. at 544. The Court reasoned that it is "not only impracticable, but impossible" for the state to provide predeprivation due process in the event of an unintentional deprivation because the state cannot predict when such a deprivation could occur. 451 U.S. at 541. *Hudson* held that unauthorized but intentional deprivations also could be constitutional violations, but only if the state did not provide a meaningful postdeprivation remedy. 468 U.S. at 533. The Court determined that while an individual state employee may intend to cause a deprivation and can predict when the deprivation will occur, the state itself cannot anticipate the "random and unauthorized conduct of its employees." *Id.* To the extent that *Parratt* held that *entirely* unintentional deprivations of property may be constitutional violations, it has been overruled. *Daniels*, 474 U.S. at 331. *Hudson*, however, remains good law.

The Court agrees with Defendants that on its face, the instant case is more like *Hudson* than *Wolff*. As in *Wolff*, the County has certain established procedures designed to protect the due process rights of applicants – specifically, the right to a protest meeting to dispute a NOV. However, in contrast to the situation in *Wolff*, in this case it was not Defendants' established procedures that allegedly caused the deprivation, but rather Defendants' alleged failure to apply

10

1    the County's own procedures in denying Plaintiffs an opportunity to be heard and recording the

2    NOV even after Plaintiffs canceled the protest meeting in reliance on Hart's promise.[2]

3    Madrigal's recordation of the NOV was intentional, and it also was unauthorized, as Hart had

4    represented that the NOV would not be recorded while Plaintiffs were engaged in the permit

5    process.  As discussed in the order dated May 4, 2010, "there is no evidence in the record that as

6    a matter of policy the County deliberately induces property owners to end their protests in order

7    to record NOVs without providing owners with an opportunity to be heard." (Docket 56 at

8    20:15-17.)  Under *Hudson*, such an unauthorized but intentional deprivation is actionable only if

9    the state does not provide a meaningful postdeprivation remedy.  Plaintiffs do not allege that the

10   state has denied them such a remedy, and indeed, Plaintiffs pursued a writ of mandate in the

11   Superior Court, seeking to expunge the NOV.

12          Plaintiffs contend, however, that the adequacy of the postdeprivation remedy is irrelevant

13   in this instance.  They rely upon *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 426 (1982), in

14   which an employee lost the right to a hearing concerning his termination because the state

15   scheduled its review after the expiration of the statutory limitations period.  *Daniels*,

16   commenting on *Logan*, noted that a "postdeprivation state remedy is inadequate when challenge

17   is to 'the state system itself.'"  *Daniels*, 474 U.S. at 340 n. 13.  In the instant case, Defendants'

18   alleged "system" – recording uncorrected NOVs if the property owner has not requested a

19   protest meeting – did not in and of itself deprive Plaintiffs of their due process rights.  Instead,

20   Plaintiffs allege that their rights were impacted by Madrigal's intentional recordation of the

21   NOV despite Hart's promise that Plaintiffs would be exempt from the County's established state

22   procedure of recording uncorrected NOVs.

23

24          [2]  Plaintiffs also rely upon *Franklin v. Aycock*, 795 F.2d 1253, 1256 (6th Cir. 1986), in
     which the Sixth Circuit concluded that a jail's disciplinary board violated an inmate's procedural

25   due process rights by failing to provide the inmate with a written statement of the evidence
     supporting and the reasons for the board's actions.  *Franklin* is similar to *Wolff* in that the board

26   appeared to follow its established procedures, but those procedures unintentionally were
     constitutionally deficient.  The instant case is distinguishable, as Plaintiffs allege not that the

27   County's established procedures are deficient, but that the County failed to apply those
     procedures to them.

28

11

1

### 2.    Whether Hart is culpable for more than negligence

2

Plaintiffs nonetheless contend that the recordation of the NOV was not the type of

3

"random and unauthorized" conduct contemplated by *Hudson*.  They point out that Madrigal's

4

action was predicable because she followed the County's typical procedure of recording

5

uncorrected NOVs.  However, if Hart merely was negligent, *Hudson* and *Daniels* foreclose

6

Plaintiffs' claim because the state offered a meaningful postdeprivation remedy for Madrigal's

7

intentional but unauthorized action.

8

Plaintiffs allege that because he failed to inform relevant persons of his promise not to

9

record the NOV, Hart is culpable for more than mere negligence.  While *Daniels* makes clear

10

that a negligent deprivation is not a constitutional violation, "[a] number of circuits have held

11

recklessness or gross negligence sufficient to state a section 1983 claim; none has held that only

12

intentional misconduct will suffice." *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989)

13

(citations omitted).  Plaintiffs rely upon *Sourbeer v. Robinson*, 791 F.2d 1094, 1104 (3d Cir.

14

1986) for the proposition that "gross negligence" is sufficient to establish a claim under the

15

Civil Rights Act.  However, *Wood* indicates that in the Ninth Circuit, a showing of "deliberate

16

indifference" is necessary to state a § 1983 claim.  879 F.2d at 588 (noting that *City of Canton v.*

17

*Harris*, 489 U.S. 378 (1989), "calls into question" prior Ninth Circuit precedent concluding that

18

gross negligence is sufficient for purposes of a § 1983 claim).  *See also L.W. v. Grubbs*, 92 F.3d

19

894, 896 (9th Cir. 1996) (establishing that "gross negligence, in and of itself, is not

20

unconstitutional").

21

In *Grubbs*, a prison employee sought to hold a state official liable for an injury the

22

employee suffered at the hands of an inmate.  The Ninth Circuit concluded that to succeed on a

23

§ 1983 claim, the employee needed to show that the state official "participated in creating a

24

dangerous condition, and acted with deliberate indifference to the known or obvious danger in

25

subjecting the plaintiff to it." *Grubbs*, 92 F.3d at 900.  The Supreme Court has noted that in the

26

context of deliberate indifference, "it is enough that the official acted or failed to act despite his

27

knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842

28

(1994).

12

It is undisputed that Hart participated in creating the situation which resulted in the improper recordation of the NOV.  Plaintiffs canceled the protest meeting – which allowed the NOV to be recorded without their having been heard – only because Hart had promised them that the NOV would not be recorded.  Defendants point to evidence indicating that Hart was unaware that Madrigal intended to record the NOV.  However, that same evidence is sufficient to support an inference that Hart knew of the potential for harm.  When Hart promised Plaintiffs that the NOV would not be recorded while Plaintiffs were engaged in the permit process, Deming and Keyon were the only other County employees present.  (Docket No. 31, Ex. C at 24:3-18.).  While neither Plaintiffs nor Defendants have directed the Court's attention to evidence that establishes conclusively that Hart was aware of a substantial risk that the NOV would be recorded if he failed to inform persons other than Deming and Keyon of his promise, the Court must view the evidence in the light most favorable to Plaintiffs.  It at least is plausible to infer that Hart, a code enforcement supervisor, knew that the County's system would generate the notice that Madrigal received and that a person other than Deming or Keyon might receive that notice and subsequently record the NOV.

The analysis does not end here, however, as Plaintiffs still must show that Hart's indifference was *deliberate*.  Plaintiffs contend that a reasonable fact-finder could infer that Hart's inaction was deliberate solely on the basis that Hart presumably knew that the NOV would be recorded unless he took action to prevent it.  Plaintiffs rely upon *Blair v. City of Pomona*, 223 F.3d 1074 (9th Cir. 2000), and *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006).  In *Blair*, a whistle-blowing police officer alleged a series of retaliatory actions by fellow officers.  The Ninth Circuit found a triable issue of material fact with respect to deliberate indifference  because the evidence was sufficient to support an inference that the officer's supervisors failed to act despite awareness of the retaliatory actions.  In *Kennedy*, the plaintiff filed a police report concerning her neighbor.  After telling the responding police officer of the neighbor's tendency for extreme violence, the plaintiff implored the officer not to confront the neighbor without first warning her so that she would have sufficient time to take protective action.  The officer assured the plaintiff that he would provide such notice before contacting the

neighbor.  The officer subsequently contacted the neighbor without giving notice, although he did inform the plaintiff of the contact after the fact.  The plaintiff then decided to stay in her home that night based upon the officer's assurance that there would be a police patrol in the neighborhood that night.  Approximately eight hours after the officer contacted the neighbor, the neighbor broke into the plaintiff's home, killed the plaintiff's husband, and severely wounded the plaintiff.  The court concluded that "[g]iven the danger created by [the police officer] that [the plaintiff] faced, we find such alleged, capricious behavior sufficient evidence of deliberate indifference."  *Kennedy*, 439 F.3d at 1065.

The instant case is distinguishable from *Blair* and *Kennedy*.  The danger created by the officer in *Kennedy* was so serious that a fact-finder properly could infer that the officer deliberately was indifferent to the plaintiff's safety.  Hart's alleged indifference falls well short of the officer's alleged conduct in *Kennedy*.  In *Blair*, the evidence supported an inference that the supervisors failed to act despite having knowledge of the improper conduct as it was occurring.  Here, there is no evidence that Hart knew that the County had generated a routine notice indicating that the NOV should be recorded or that Madrigal intended to record the NOV.  Nonetheless, because Defendants seek summary judgment, they bear the initial burden of identifying the evidence that demonstrates the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Based upon the present record, the evidence supports an inference that Hart knew that the NOV would be recorded in accordance with the County's normal procedures, and there is no evidence that Hart's failure to act was unintentional.

Accordingly, while it is a close question, and despite *Daniel*s' bar on § 1983 claims for purely negligent conduct and *Hudson*'s bar on § 1983 claims for intentional but unauthorized deprivations when the state offers a meaningful postdeprivation remedy, Plaintiffs' allegation that their procedural due process rights were violated when the NOV was recorded is sufficient to support a § 1983 claim under *Grubbs*.

**C.   Reexamination of issues previously determined to be moot**

In light of the foregoing discussion, the Court must reexamine two issues that previously

14

were determined to be moot:  (1) whether Santa Cruz County Code Chapter 13.10.525(c)(3) applies to the property at issue or the improvements Plaintiffs sought to have permitted and (2) whether the Santa Cruz County Building and Fire Code Appeals Board ("BAFCAB") had jurisdiction to hear an appeal of the code enforcement and permitting decisions of the Santa Cruz County Planning Department.  These issues were briefed fully in connection with Defendants' motion for summary judgment.

**1.       Santa Cruz County Code Chapter 13.10.525(c)**

Santa Cruz County Code Chapter 13.10.525(c) provides that:

(c)       The height regulations for fences and/or retaining walls are:

    1.       The height of fences and/or retaining walls is determined by measuring the exposed face of the fence and/or wall at its tallest point, from finished grade at the base, to the top of the fence and/or wall, including all ornamental and architectural projections.

    2.       Except as specified in Sections 13.10.525(c)(3), and 16.50.095, no fence and/or retaining wall shall exceed six feet in height if located within a required side or rear yard not abutting on a street, and no fence, hedge, and/or retaining wall shall exceed three feet in height if located in a front yard or other yard abutting a street, except that heights up to six feet may be allowed by a Level III Development Permit Approval, and heights greater than six feet may be allowed by a Level V Development Permit Approval. (See Section 12.10.070(b) for building permit requirements.)

    3.       In agricultural zone districts, fencing for agricultural purposes may have heights up to 6 feet in all yards without the need for Development Permit approval provided that such fencing, including gates, is:

        (i)       Six feet or less in height;

        (ii)      Made of wire which is spaced a minimum of 6 inches apart (i.e., typical field fencing); or

        (iii)     Made of horizontally oriented wooden members which are spaced a minimum of one foot apart (i.e., typical wooden corral fencing); provided, however, that a Development Permit approval shall be required for this type of fencing on all properties adjacent to State Route (High-way One).

        (iv)     If a Coastal Development Permit is required, i. - iii. do not apply and a Coastal Development Permit is required to exceed the height limit

The parties agree that Plaintiffs' property was located in an area zoned for "residential agriculture."  Plaintiffs contend that this is an "agricultural zone district" for purposes of

subsection (c)(3) and that it therefore was permissible, even without a permit, for them to have a hedge and chain-link fence six feet in height.  Defendants dispute that Plaintiffs' property was in an agricultural zone district and that subsection (c)(3) applies to hedges and chain-link fences. Because it is clear that subsection (c)(3) does not apply to Plaintiffs' desired hedge and fence, the Court need not determine whether Plaintiffs' property was located in an agricultural zone district.

Irrespective of any other requirements of subsections (c)(3)(i), (ii), and (iii), the main body of subsection (c)(3) provides that fencing exempt from permit approval only can be "up to 6 feet" in height.  Defendants contend that in order to qualify under subsection (c)(3), fencing also must satisfy either subsection (c)(ii) or (c)(iii), i.e., that *only* "typical field fencing" or "typical wooden corral fencing" of six feet or less in height may qualify under subsection (c)(3). However, Defendants' interpretation ignores subsection (c)(3)(i).  Under Plaintiffs' interpretation, fencing qualifies under subsection (c)(3) if any one of the conditions of subsections (c)(3)(i), (ii), and (iii) is satisfied.  At first glance, the fact that the subsections are separated by the word "or" suggests that this interpretation is correct. *See In re Pacific-Atlantic Trading Co.*, 64 F.3d 1292, 1302 (9th Cir. 1995) (citing *United States v. Behnezhad*, 907 F.2d 896, 898 (9th Cir. 1990)).  At the same time, a court should read a statute "to give meaning to all of its parts." *In re Pacific-Atlantic*, 64 F.3d at 1303.  *See also Shoemaker v. Myers*, 52 Cal. 3d 1, 22 (1990) (noting that the California Supreme court prefers not to "construe statutory provisions so as to render them superfluous.").  If Plaintiffs' interpretation were correct, *any* form of fencing six feet or less in height would qualify under subsection (c)(3)(i), rendering not only subsections (c)(3)(ii) and (iii) but also subsection (c)(3)(i) itself superfluous, as the main body of subsection (c)(3) already requires that the permissible fencing be six feet or less in height.

It is clear that subsection (c)(3) has been drafted inartfully, and the Court is faced with a choice between two maxims of statutory construction.  Neither Plaintiffs nor Defendants point to legislative history to support their interpretation, and both interpretations are less than ideal because they render subsection (c)(3)(i) superfluous.  The Court recognizes the logic of

16

Plaintiffs' grammatical argument, but following that argument would read not only subsection (c)(3)(i) but also subsections (c)(3)(ii) and (iii) out of the statute.  Faced with this choice, the Court concludes that the drafting error lies only with subsection (c)(3)(i) and that the drafters intended that subsections (c)(3)(ii) and (iii) impose conditions additional to the basic requirement that the fencing be no greater than six feet in height, as is specified in the main body of subsection (c)(3).  Accordingly, the Court concludes that subsection (c)(3) applies only to "typical field fencing" or "typical wooden corral fencing" that is six feet or less in height.  Plaintiffs' hedge and chain-link fence do not qualify under this code.  Accordingly, summary judgment will be granted in favor of Defendants with respect to Plaintiffs' claims concerning Santa Cruz County Code Chapter 13.10.525(c)(3).[3]

### 2.    The BAFCAB

Plaintiffs contend that the County deprived them of procedural due process by wrongfully denying them the opportunity to appeal the County's permitting and code enforcement decisions to the BAFCAB, a local appeals board with jurisdiction over building permit issues.  Plaintiffs offer a two-part explanation.  First, they contend that Chapter 13.10.525 is a "building standard" rather than a zoning ordinance.   Second, they claim that the BAFCAB has jurisdiction over decisions concerning all building standards, including Chapter 13.10.525.

### a.    Whether Chapter 13.10.525 is a building standard or a zoning ordinance

With respect to the first issue, Defendants point out that Chapter 13.10.525 was enacted pursuant to California Government Code § 65850, which provides that the legislative body of any county may adopt zoning ordinances that regulate "[t]he location, height, bulk, number of stories, and size of buildings and structures," Cal. Gov't Code § 65850(c), and that "[e]stablish and maintain building setback lines," Cal. Gov't Code § 65850(e).  Plaintiffs nonetheless claim that Chapter 13.10.525 is a "building standard" under the Building Code.

---

[3]  Plaintiffs also contend that Chapter 13.10.525(b) is preempted by Title 24 of the California Code of Regulations (the "Building Code").  This argument will be rejected as discussed below.  *See* Section II.C.2.a, *infra*.

California Health and Safety Code § 18909 defines the term "building standard" as "any rule, regulation, order, or other requirement, . . . that specifically regulates . . . the method of use, properties, performance, or types of materials used in the construction . . . of a building, structure, factory-built housing, or other improvement to real property . . . ." Cal. Health & Safety Code § 18909(a).  Thus, a "building standard" focuses on the regulation of "materials used in the construction" of a "structure."  A "structure" is defined as "that which is built or constructed, an edifice or building of any kind or any piece of work artificially built or composed of parts joined together in some definite manner . . . ." Cal. Health & Safety Code § 18909(a).  Plaintiffs contend that a fence is a "structure," and the Court agrees that fencing typically is a "piece of work" that is "artificially built or composed of parts joined together in some definite manner."  Plaintiffs contend that a hedge is a structure as well, but a hedge is not "built," "constructed," "artificial," or "composed of parts joined together" within the ordinary meaning of these terms.

The issue is whether Chapter 13.10.525 seeks to regulate aspects of the "materials used in construction" of a structure pursuant to California Health & Safety Code § 18909(a) or seeks to regulate the "location" or "height" of structures pursuant to California Government Code § 65850(a).  Plaintiffs point out that Chapter 13.10.525(c)(ii) and (iii) refer specifically to "wire" and "wooden members."  However, Chapter 13.10.525 does not necessarily require that fencing be made from any particular materials or constructed in any particular fashion; rather, it prevents a property owner from placing certain fencing in particular *locations* depending on the *height* of the fence.  Regulation of both the location and height of structures specifically is granted to counties by California Government Code § 65850(a).

Plaintiffs contend that Chapter 13.10.525 conflicts with and therefore is preempted by the Building Code.  While indeed Building Code § 105.2 provides that building permits "shall not be required" for fences "not over 6 feet (1829 mm) high," Chapter 13.10.525 does not necessarily prevent a property owner from constructing a fence; it restricts the *location* of a fence.  Moreover, exemption from the Building Code's permitting requirements is not necessarily authorization to build.  Building Code § 105.2 also states that "[e]xemptions from

18

1  permit requirements of this code shall not be deemed to grant authorization for any work to be

2  done in any manner in violation of the provisions of this code or any other laws or ordinances of

3  this jurisdiction."

4              **b.    Jurisdiction of the BAFCAB**

5          The BAFCAB's jurisdiction is statutory.  California Health and Safety Code § 17985

6  requires California municipalities to adopt the Building Code, and the County has done so at

7  County Code Chapter 12.10.[4]  California Health and Safety Code § 17920.5 defines a "local

8  appeals board" as "the board or agency of a city or county which is authorized by the governing

9  body of the city or county to hear appeals regarding the building requirements of the city or

10 county."  California Health and Safety Code § 19957.5 provides that a county "may appoint"

11 such local appeals boards to hear written appeals from the county's building department.

12 Pursuant to this authority, the County promulgated County Code Chapter 2.100.010 to create the

13 BAFCAB.[5]  County Code Chapter 2.100.050 defines the powers and duties of the BAFCAB.  As

14 is relevant here, the BAFCAB had jurisdiction to "[c]onsider recommendations to the board of

15 supervisors concerning improvement of building, grading, and fire regulations for the county,"

16 "[h]ear all appeals filed by persons pursuant to provisions of Chapters 7.92 and 12.12 of this

17 code," and "[h]ear all appeals filed by persons regarding actions taken by the building

18 department of the county in the enforcement of the requirements of [California Health and

19 Safety Code § 19955 *et seq.*] relating to access to public accommodations by physically

20 handicapped persons."  Santa Cruz County Code Chapter 2.100.050(C), (D), (E).

21         Plaintiffs do not seek to recommend improvements to the building regulations of the

22 county, nor do they seek to file an appeal concerning access to public accommodations by

23 physically handicapped persons.  County Code Chapter 7.92 is the County's fire code.  Finally,

24 ────────────────

25     [4]  A municipality also may make changes to the Building Code upon making express

26 findings that such changes are necessary as a result of local climatic, geological, or topographical
   conditions.  Cal. Health & Safety Code §§ 17985.5, 17985.7.

27     [5]  Chapter 2.100 and its subchapters were repealed subsequent to the relevant facts at

28 issue, and the BAFCAB no longer exists.

Case No. 5:09-cv-00373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR RECONSIDERATION, ETC.
(JFEX1)

County Code Chapter 12.12 provides that aggrieved persons may appeal certain acts or determinations of "the Building Official or of any other employee charged with the administration and enforcement of the provisions of Chapter 12.10." County Code Chapter 12.12 allows appeals of the following acts or determinations only: "[d]eterminations of the suitability of alternate building materials and methods of construction for use in this County," "[i]nterpretations of the provisions of the Uniform Codes adopted by Chapter 12.10," "[a]ctions taken in the enforcement of the requirements of Section 19955 *et seq.* of the Health and Safety Code relating to access to public accommodations by persons with disabilities, including the ratification of hardship exceptions granted pursuant to Section 19957," and "[d]ecisions, orders or determinations made by the Fire Code Official relative to the application and interpretation of Chapter 7.92." Plaintiffs' prospective appeal did not relate to any of these enumerated acts or decisions. The County made no determination with respect to the suitability of building materials or the method of construction of Plaintiffs' proposed fence. Pursuant to its authority under California Government Code § 65850(a), the County sought only to restrict the location and height of the fence under Chapter 13.10.525. Accordingly, summary judgment will be granted in favor of Defendants with respect to Plaintiffs' claims concerning the BAFCAB.[6]

## IV.  CONCLUSION

Plaintiffs' motion for reconsideration will be granted in part. Plaintiffs' claims with respect to Daly's alleged arbitrary and capricious conduct and the alleged deprivation of procedural due process at the time of recordation of the NOV will be reinstated. The motion for reconsideration otherwise will be denied. Summary judgment will be granted in favor of Defendants with respect to Plaintiffs' claims concerning Santa Cruz County Code Chapter

---

[6] Plaintiffs appear to contend that because the BAFCAB lacked jurisdiction to hear an appeal from a decision concerning Chapter 13.10.525, the County violated the Constitution by failing to create a suitable appellate board that did have such jurisdiction. In their motion for summary judgment, Defendants satisfied their initial burden by demonstrating the absence of a triable issue of material fact with respect to either the BAFCAB's statutory jurisdiction or the propriety of that jurisdiction. Plaintiffs do not explain how the Constitution has been violated by the County's act of limiting the BAFCAB's jurisdiction.

Case No. 5:09-cv-00373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR RECONSIDERATION, ETC.
(JFEX1)

1

13.10.525 and the BAFCAB.

2

3    **IT IS SO ORDERED**

4

DATED: 10/6/10

5    _____
JEREMY FOGEL
6    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:09-cv-00373 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR RECONSIDERATION, ETC.
(JFEX1)